Steve W. Berman (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave, Suite 2000
Seattle, WA 98101
(206) 623-7292
*steve@hbsslaw.com*

Elaine T. Byszewski (SBN 222304)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150
*elaine@hbsslaw.com*

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLEN LEE, on behalf of himself and all others similarly situated, | Case No. 3:18-cv-5987 |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **COMPLAINT** |
| TICKETMASTER L.L.C., a Virginia corporation, LIVE NATION ENTERTAINMENT, INC., a Delaware corporation, | DEMAND FOR JURY TRIAL |
| Defendants. | |

1

2

**TABLE OF CONTENTS**

Page

I.      OVERVIEW .................................................................................................1

II.     PARTIES ....................................................................................................2

III.    JURISDICTION AND VENUE ......................................................................2

IV.     FACTUAL ALLEGATIONS ..........................................................................3

        A.      The Reselling of Tickets Is a $5-Billion Industry in the United States. ......................3

        B.      Undercover Investigation Reveals Ticketmaster's Scheme to Cash in Twice
                by Permitting, Facilitating, and Actively Encouraging Secondary Market Sales
                by Scalpers on its Online Resale Platform. .................................................................3

        C.      Ticketmaster's Response to the Exposé Is to Investigate the Admittedly
                "Inappropriate Activity" .............................................................................................7

        D.      U.S. Senators Open an Inquiry Into Ticketmaster's Resale Program ....................9

V.      CLASS ACTION ALLEGATIONS ..............................................................10

VI.     CAUSES OF ACTION ...............................................................................12

        FIRST CAUSE OF ACTION
        VIOLATION OF CAL. BUS. & PROF. CODE § 17200 ...............................12

        SECOND CAUSE OF ACTION
        VIOLATION OF COMMON LAW OF UNJUST ENRICHMENT ..................14

        JURY TRIAL DEMAND ..............................................................................16

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                    - i -

010777-11 1067111 V3

1    Plaintiff Allen Lee brings this action on behalf of himself and all others similarly situated

2    against TICKETMASTER L.L.C. and LIVE NATION ENTERTAINMENT, INC. (collectively,

3    Ticketmaster or defendants).  Plaintiff's allegations against defendants are based upon information

4    and belief and upon investigation of plaintiff's counsel, except for allegations specifically pertaining

5    to plaintiff, which are based upon his personal knowledge.

6                                    **I.    OVERVIEW**

7        1.    Companies should treat consumers fairly.  But a company fails at this when it accepts

8    kickbacks for secretly facilitating a shortage of its product and then a sale by a third party at a higher

9    price.  This isn't right.  But Ticketmaster was just exposed for engaging in just such a scheme.

10       2.    Have you ever wondered why Ticketmaster has been unable to rid itself of the

11   scalpers who purchase mass quantities of concert or sports tickets from its website and then resell

12   them for much more minutes later?  A better question all along may have been why did Ticketmaster

13   not want to.  The answer: Ticketmaster hasn't wanted to rid itself of scalpers because, as it turns out,

14   they have been working with them.

15       3.    Ticketmaster has actually facilitated the sale of tickets to the secondary market by

16   secretly implementing a "Resale Partner Program" supported by TradeDesk, which Ticketmaster

17   acknowledges it "built expressly for professional resellers."  And Ticketmaster does this in order to

18   receive a second cut on tickets—that is *even more than* the original cut Ticketmaster receives.

19       4.    For example, "if Ticketmaster collects $25.75 on a $209.50 ticket on the initial sale,

20   when the owner posts it for resale for $400 on the site, the company stands to collect an additional

21   $76 on the same ticket."[1]  No wonder it isn't content to just sell each ticket once.  And all this despite

22   a code of conduct for resellers that specifically prohibits them "from purchasing tickets that exceed

23   the posted ticket limit for an event," and "prohibits the creation of fictitious user accounts for the

24   purpose of circumventing ticket limit detection in order to amass tickets intended for resale."[2]

25   _____

26       [1] http://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.html.

27       [2] https://www.mercurynews.com/2018/09/19/ticketmaster-schemes-with-scalpers-so-you-pay-more-report/.

28

COMPLAINT                                    - 1 -

5.      In other words, "If you can't beat 'em, join 'em." But this is unfair to consumers who typically pay more on the secondary market for the tickets themselves, of which a percentage kicks back to Ticketmaster from the "professional reseller" and/or for service fees paid to Ticketmaster, which are higher on more expensive tickets.

6.      Accordingly, and for all the reasons set forth herein, defendants have engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 and have been unjustly enriched in violation of the common law of unjust enrichment. So plaintiff, on behalf of himself and a nationwide class of all end-user purchasers, seeks restitution of money paid to Ticketmaster for secondary market sales, as well as attorneys' fees and costs of suit.

## II.      PARTIES

7.      Plaintiff Allen Lee is a resident of Millbrae, California. Plaintiff purchased tickets, originally sold by Ticketmaster, on the secondary market, specifically at ticketexchangebyticketmaster.com, for nine sporting events held in 2016 through 2018.

8.      Ticketmaster L.L.C., is a Virginia corporation headquartered in Beverly Hills, California. Ticketmaster is the live-event ticket sales and distribution subsidiary of Live Nation Entertainment, Inc.

9.      Live Nation Entertainment, Inc., is a Delaware corporation headquartered in Beverly Hills, California.

## III.      JURISDICTION AND VENUE

10.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, and the class includes members who are citizens of a different state than defendant.

11.      This Court has personal jurisdiction over defendants because their principal places of business are located in California.

12.      Venue is proper in this Court under 28 U.S.C. § 1391(b), because defendants sell tickets throughout the State of California, including in this judicial district.

COMPLAINT                                          - 2 -
010777-11 1067111 V3

1

## IV.   FACTUAL ALLEGATIONS

2

**A.     The Reselling of Tickets Is a $5-Billion Industry in the United States.**

3

       13.    "Ticketmaster is owned by the world's largest concert promoter, Live Nation—which

4

brought in $10.3 billion in revenue last year—and sells tickets to concerts, pro sports games, theater

5

shows and other events."[3]

6

       14.    Meanwhile, the reselling of tickets has grown into a $5-billion industry in the U.S.[4]

7

       15.    "Scalpers using bots to scoop up huge numbers of tickets to resell at much-inflated

8

prices have become a curse for the concert-going public.  Shows can sell out in moments, with

9

thousands of tickets appearing on reseller websites minutes later.  So what is Ticketmaster, the

10

largest player in the ticketing industry, doing about a problem afflicting its customers with added

11

costs and hassles?  Cashing in—twice."[5]

12

**B.     Undercover Investigation Reveals Ticketmaster's Scheme to Cash in Twice by Permitting, Facilitating, and Actively Encouraging Secondary Market Sales**

13

**by Scalpers Using its Online Resale Systems.**

14

       16.    As first reported on September 19, 2018, in July 2018, Canada's national broadcaster

15

CBC and the Toronto Star newspaper sent undercover reporters to Ticket Summit, a ticketing and

16

live-entertainment convention at Caesars Palace in Las Vegas, where Ticketmaster reportedly held a

17

private event for scalpers, whom the company refers to as "resellers" and "brokers."[6]

18

       17.    "Posing as scalpers and equipped with hidden cameras, the journalists were pitched

19

on Ticketmaster's professional reseller program.  Company representatives told them Ticketmaster's

20

resale division turns a blind eye to scalpers who use ticket-buying bots and fake identities to snatch

21

up tickets and then resell them on the site for inflated prices."[7]

22

23

---

24

   [3] http://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.html.

25

   [4] *Id.*

26

   [5] *Id.*

27

   [6] *Id.*

   [7] *Id.*

28

18.     The reason for this is a simple one of greed: the "pricey resale tickets include extra fees for Ticketmaster."  For example, "if Ticketmaster collects $25.75 on a $209.50 ticket on the initial sale, when the owner posts it for resale for $400 on the site, the company stands to collect an additional $76 on the same ticket."[8]

19.     At the convention, Casey Klein, Ticketmaster Resale director, held a session that was closed to the media entitled, "We appreciate your partnership: More brokers are listing with Ticketmaster than ever before."[9]  "The audience heard that Ticketmaster has developed a professional reseller program and within the past year launched TradeDesk, a web-based inventory-management system for scalpers. . . . TradeDesk allows scalpers to upload large quantities of tickets purchased from Ticketmaster's site and quickly list them again for resale.  With the click of a button, scalpers can hike or drop prices on reams of tickets on Ticketmaster's site based on their assessment of fan demand."[10]

20.     "The resale program and TradeDesk appear closely guarded by Ticketmaster.  Neither TradeDesk nor the professional reseller program are mentioned anywhere on Ticketmaster's website or in its corporate reports . . . . To access the company's TradeDesk website, a person must first send in a registration request."[11]

21.     Predictably, "it seems as though the ticket-selling giant has been keeping the program under wraps, given the public outrage the program would likely incite."[12]

---

[8] http://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.htm; https://www.cbc.ca/news/business/ticketmaster-prices-scalpers-bruno-mars-1.4826914.

[9] https://www.cbc.ca/news/business/a-public-relations-nightmare-ticketmaster-recruits-pros-for-secret-scalper-program-1.4828535.

[10] http://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.html.

[11] *Id*.

[12] https://liveforlivemusic.com/news/ticketmaster-tradedesk-scalp/.

22.     According to Ticketmaster's 39-page "Professional Reseller Handbook," also uncovered by CBC, TradeDesk is "Ticketmaster Resale's custom-designed and web-based, inventory management, sales and full point-of-sale system built expressly for professional resellers."[13]

23.     Tickets from the primary market can be uploaded to TradeDesk.  And the "TradeDesk Marketplace" provides a platform where professional resellers can also "view and purchase inventory from fans"[14]—even though Ticketmaster secondary sites purport to be "Introducing Fan-to-Fan Resale"[15] and "Powering Official Fan-to-Fan Marketplaces."[16]

24.     "Transfer" is a "TradeDesk feature that provides resellers the ability to easily move any Ticketmaster Verified ticket from one account to another without the need for PDFs or barcodes."  And Ticketmaster profits from supporting and encouraging scalpers, because they pay a "Seller Fee" to Ticketmaster that is a percentage of the ticket price.[17]

25.     Ticketmaster's predecessor to TradeDesk was EventInventory; on its website it now describes TradeDesk as "Ticketmaster Resale's newest broker tool," replacing EventInventory.[18]

26.     Back on the trade show floor of the Las Vegas conference, Ticketmaster representatives handed out cupcakes, and at cubicle workstations they provided online demonstrations of TradeDesk.  One of the presenters, unaware he was speaking to an undercover reporter, said that Ticketmaster's resale division is not interested in whether clients use automated software and fake identities to bypass the box office's ticket-buying limits.  He commented: "If you want to get a good show and the ticket limit is six or eight ... you're not going to make a living on six or eight tickets."[19]

---

[13] https://www.documentcloud.org/documents/4901430-TMR-Professional-Reseller-Handbook-1-1.html (Professional Reseller Handbook), at 8.

[14] *Id.*

[15] https://www.ticketmaster.com/verified.

[16] https://www.ticketexchangebyticketmaster.com/.

[17] Professional Reseller Handbook at 9.

[18] https://www.eventinventory.com/.

[19] https://www.cbc.ca/news/business/a-public-relations-nightmare-ticketmaster-recruits-pros-for-secret-scalper-program-1.4828535.

27.     Although the firm has a "buyer abuse" department that keeps an eye out for blatantly suspicious online activity, the Ticketmaster representative said that its reselling department doesn't police users of TradeDesk.  When asked whether Ticketmaster cares if scalpers use bots to buy their tickets, he said: "We don't share reports, we don't share names, we don't share account information with the primary site. Period."[20]

28.     During an online video conference demonstration of TradeDesk at an earlier stage of the undercover investigation back in March 2018, another Ticketmaster employee was asked whether the company would ban scalpers who violated the firm's terms of service by getting around ticket-buying limits.  He responded: "We've spent millions of dollars on this tool. The last thing we'd want to do is get brokers caught up to where they can't sell inventory with us."[21]

29.     According to CBC, he also said that 100 scalpers in North America, including a handful in Canada, are using TradeDesk to move between a few thousand and several million tickets per year.  "I think our biggest broker right now has probably grabbed around five million," he said.[22]

30.     There are brokers with "literally a couple of hundred accounts" on TradeDesk, and that it's "not something that we look at or report."[23]

31.     Indeed, Ticketmaster's Professional Reseller Handbook reveals that the company runs a reward program for scalpers who sell tickets on "Ticketmaster Resale consumer websites."[24]  In the words of Ticketmaster, it "rewards professional reseller partners" for sales performance, unlocking discounts on the seller fee percentage if, for example, their purchase order total reflects improvement year-over-year—and Ticketmaster provides an example of a purchase order total exceeding $5M—or

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] https://www.rollingstone.com/music/music-news/ticketmaster-cheating-scalpers-726353/.

[24] Professional Reseller Handbook at 5, 9-12.  These include sites such as https://www.ticketexchangebyticketmaster.com/, which purports to be "Powering Official Fan-to-Fan Marketplaces"; https://www.ticketmaster.com/verified, which purports to be "Introducing Fan-to-Fan Resale" and "HAS MORE TICKETS IN STORE THAN EVER BEFORE"; and https://www.ticketsnow.com/, another Ticketmaster company.

they achieve "a year-over-year increase in the number of tickets [] sold on Ticketmaster Resale platforms."[25]  Thus, Ticketmaster is actively rewarding scalpers for selling on its secondary market.

**C.      Ticketmaster's Response to the Exposé Is to Investigate the Admittedly "Inappropriate Activity."**

32.      "As the world's leading ticketing platform, representing thousands of teams, artists and venues, we believe it is our job to offer a marketplace that provides a safe and fair place for fans to shop, buy and sell tickets in both the primary and secondary markets," wrote Catherine Martin, senior vice-president of communications, based in Los Angeles.

33.      But at the same time Ticketmaster acknowledges that its code of conduct for sellers "specifically prohibits resellers from purchasing tickets that exceed the posted ticket limit for an event," and the firm's policy "prohibits the creation of fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale."[26]

34.      So Ticketmaster said it was "categorically untrue that Ticketmaster has any program in place to enable resellers to acquire large volumes of tickets at the expense of consumers."[27]

35.      But "the CBC report made no claims about a system to acquire tickets, but rather disclosed TradeDesk, an online tool that helps scalpers resell their inventory by instantly 'synching' their Ticketmaster.com accounts to upload already-purchased event seats onto resale websites—including Ticketmaster."[28]

36.      And Ticketmaster did not deny that its resale division is not policing activity that would indicate violations on the primary site.  Nor did it deny that the resale division is actively encouraging those engaging in such violations to use TradeDesk to unload mass quantities of tickets on the secondary market.

---

[25] Professional Reseller Handbook at 9, 12.

[26] https://www.mercurynews.com/2018/09/19/ticketmaster-schemes-with-scalpers-so-you-pay-more-report/.

[27] *Id*.

[28] https://www.cbc.ca/news/business/a-public-relations-nightmare-ticketmaster-recruits-pros-for-secret-scalper-program-1.4828535.

37.     So now Ticketmaster has started an internal review of its professional resellers' accounts and employee practices "to ensure that our policies are being upheld by all stakeholders." And it said that: "Moving forward we will be putting additional measures in place to proactively monitor for this type of inappropriate activity."[29]

38.     Richard Powers, associate professor at the University of Toronto's Rotman School of Management, agrees that Ticketmaster's conduct has been inappropriate and unethical.  With its near monopoly on box-office tickets, Ticketmaster should not also be allowed to profit from the scalping of those same tickets, he says.  "Helping to create a secondary market where purchasers are duped into paying higher prices and securing themselves a second commission should be illegal."[30]

39.     Reg Walker, a security consultant and expert on ticket scalping in the U.K., says that Ticketmaster doesn't ask "the scalpers how or where they obtained the tickets as they already know the answer. The lack of due diligence is appalling and demonstrates a singular contempt for genuine music and sports fans who are unable to obtain tickets at face value due to industrial ticket harvesting by scalpers."[31]

40.     Indeed, on its own website, Ticketmaster refers to the activity of professional scalpers as "unfair competition."  But now it has been caught secretly permitting, facilitating, and actively encouraging the sale of tickets by scalpers on the secondary market using its TradeDesk platform—all for a second cut on those sales.[32]

---

[29] https://www.mercurynews.com/2018/09/19/ticketmaster-schemes-with-scalpers-so-you-pay-more-report/.

[30] https://www.cbc.ca/news/business/a-public-relations-nightmare-ticketmaster-recruits-pros-for-secret-scalper-program-1.4828535.

[31] https://www.thestar.com/news/investigations/2018/09/22/ticketmaster-facing-class-action-lawsuits-over-ticket-resales.html.

[32] https://www.ticketmaster.com/creditcardentry ("Why is Credit Card Entry the only option for some events, or some sections? When Credit Card Entry is the only option it's probably because the tickets are in high demand, and the artist, team, or venue wants true fans like you to get the seats you want at face value by eliminating unfair competition from professional scalpers. Without the ability to resell tickets at steep prices, scalpers have no reason to snatch them up when they go on sale using automated software, or 'bots.'").

1

**D.      U.S. Senators Open an Inquiry Into Ticketmaster's Resale Program.**

2          41.      On September 21, 2018, U.S. Senators Jerry Moran (R-Kan.) and Richard Blumenthal

3    (D-Conn.) sent a letter to Live Nation's CEO regarding the allegations that Ticketmaster "recruits

4    and employs professional ticket scalpers to circumvent the ticket purchasing limits on its own

5    primary ticket sales platform in an effort to expand its ticket resale division" and "utilizes a

6    professional reseller program called TradeDesk, which provides a web-based inventory for scalpers

7    to effectively purchase large quantities of tickets from Ticketmaster's primary ticket sales website

8    and resell these tickets for higher prices on its own resale platform."  The letter referred to

9    allegations of "TradeDesk users moving up to several million tickets per year," such that the alleged

10   "harms to consumers made in this piece are serious and deserve immediate attention."[33]

11         42.      Given the Senators' "ongoing interest in protecting consumers from unfair and

12   deceptive practices" and concern that Ticketmaster may have violated the *Better Online Ticket Sales*

13   *(BOTS) Act of 2016,* they "seek clarification on the use of this program" and requested responses to

14   the following questions by October 5, 2018:

15
16   - Describe the event ticket purchasing limits that Ticketmaster currently employs for
       sales on its primary ticket sales platform. Additionally, how does the company
       identify computer programs used to circumvent these purchasing limits?

17
18   - Do Ticketmaster's ticket purchasing limits and associated detection practices apply to
       users of its online program, TradeDesk? If not, please explain.

19
20   - What are the specific rules and processes of compliance for participating TradeDesk
       users as it relates to ticket purchasing limits and other relevant consumer protection
21     priorities? Please share any documents and guidance materials that are provided to
       TradeDesk users.

22   - What role does Ticketmaster's Professional Reseller Handbook play in deterring its
       resellers from engaging in illegal ticket purchasing activities?[34]
23

24         43.      Thus, Ticketmaster's scheme to partner up with scalpers in order to cash in twice on

25   ticket sales has even caught the attention of U.S. Senators, who are now requiring it to account.

26   _____

27   [33] https://variety.com/2018/music/news/senators-question-ticketmaster-live-nation-on-alleged-
     scalper-collusion-1202956495/.

28   [34] *Id.*

44.     Accordingly, and for all the reasons set forth herein, defendants have engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 and have been unjustly enriched in violation of the common law of unjust enrichment.  So plaintiff, on behalf of himself and a nationwide class, seeks restitution, attorneys' fees, and costs of suit.

## V.     CLASS ACTION ALLEGATIONS

45.     Under Rule 23 of the Federal Rules of Civil Procedure, plaintiff seeks certification of a class defined as follows:

> All end-user purchasers in the United States who purchased a
> secondary market Ticketmaster ticket from a professional reseller
> participating in Ticketmaster's resale partner program and/or using
> TradeDesk or a similar system operated by defendants, such as
> EventInventory or eimarketplace.

46.     Excluded from the class are defendants; the officers, directors or employees of defendants; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of defendants.  Also, excluded from the class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

47.     Plaintiff does not know the exact number of class members at the present time. However, due to the nature of the trade and commerce involved, there appear to be hundreds of thousands if not millions of class members such that joinder of all class members is impracticable.

48.     The class is defined by objective criteria, and notice can be provided through techniques similar to those customarily used in other consumer fraud cases and complex class actions, including use of defendants' records of sale by third parties using its TradeDesk platform.

49.     There are questions of law and fact common to the class, including whether defendants in fact permitted, facilitated, and/or actively encouraged sales on the secondary market by scalpers in return for a second cut on ticket sales.

50.     Plaintiff asserts claims that are typical of the class.  Plaintiff and all class members have been subjected to the same wrongful conduct because they all have purchased and paid more for Ticketmaster tickets on the secondary market and/or paid a cut that went to Ticketmaster after it

1   secretly permitted, facilitated, and/or actively encouraged the sale of its tickets by scalpers on the

2   secondary market using its TradeDesk platform.

3          51.     Plaintiff will fairly and adequately represent and protect the interests of the class.

4   Plaintiff is represented by counsel competent and experienced in both consumer protection and class

5   action litigation.

6          52.     Class certification is appropriate because defendants have acted on grounds that apply

7   generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate

8   respecting the class as a whole.

9          53.     Class certification is also appropriate because common questions of law and fact

10  substantially predominate over any questions that may affect only individual members of the class,

11  including, *inter alia*, the following:

12              a.   whether defendants in fact permitted, facilitated, and/or
                     actively encouraged sales on the secondary market by scalpers
13                   in return for a second cut on ticket sales;

14              b.   whether such conduct violates the unlawful prong of section
                     17200;
15
                c.   whether such conduct violates the unfair prong of section
16                   17200;

17              d.   whether such conduct caused defendants' unjust enrichment at
                     class members' expense; and
18
                e.   whether restitution and/or injunctive relief should be provided
19                   to class members as a result of defendants' wrongful conduct.

20         54.     A class action is superior to other available methods for the fair and efficient

21  adjudication of this controversy, since joinder of all the individual class members is impracticable.

22  Furthermore, because the injury suffered by each individual class member may be relatively small,

23  the expense and burden of individual litigation would make it very difficult or impossible for

24  individual class members to redress the wrongs done to each of them individually and the burden

25  imposed on the judicial system would be enormous.

26         55.     The prosecution of separate actions by the individual class members would create a

27  risk of inconsistent or varying adjudications, which would establish incompatible standards of

28

COMPLAINT                              - 11 -
010777-11 1067111 V3

conduct for defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF CAL. BUS. & PROF. CODE § 17200

56.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

57.    Plaintiff asserts this claim on behalf of the nationwide class.  Application of California law is appropriate given defendants' headquarters are in California and key decisions regarding the TradeDesk platform and related business practices described herein were presumably developed at their in-state headquarters, such that the unfair business practices described herein emanated from California.

58.    Cal. Bus. & Prof. Code § 17200 prohibits unlawful and unfair business acts and practices.  Defendants have engaged in unlawful and unfair business acts and practices in violation of the UCL as a result of the wrongful conduct alleged herein.

59.    Defendants have violated the unlawful prong of section 17200, because the acts and practices set forth herein violate the *Better Online Ticket Sales (BOTS) Act of 2016,* 15 U.S.C.A. § 45c.  The BOTS Act states in subsection (a) (1) that it shall be unlawful for any person:

> (A) to circumvent a security measure, access control system, or
> other technological control or measure on an Internet website or
> online service that is used by the ticket issuer to enforce posted
> event ticket purchasing limits or to maintain the integrity of posted
> online ticket purchasing order rules; or
> (B) to sell or offer to sell any event ticket in interstate commerce
> obtained in violation of subparagraph (A) if the person selling or
> offering to sell the ticket either--

(i) participated directly in or had the ability to control the

conduct in violation of subparagraph (A); or

(ii) knew or should have known that the event ticket was

acquired in violation of subparagraph (A).

Ticketmaster has violated these provisions by the conduct set forth herein.

60.     The BOTS Act also states in subsection (b) that any "violation of subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))."  For this reason, Ticketmaster also violates the unfair prong of section 17200.

61.     Defendants have also violated the unfair prong of section 17200, because the acts and practices set forth herein offend established public policies supporting honesty and fair dealing in consumer transactions, as well as the policy against the "circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for any given event," as set forth in the BOTS Act.  Defendants' conduct as described herein is also unethical, oppressive, unscrupulous and injurious to consumers.  The harm that these acts and practices cause greatly outweighs any benefits associated with them.  And consumers could not have reasonably avoided the harm because they did not know that Ticketmaster permitted, facilitated, and/or encouraged professional resellers, or scalpers, to sell its tickets on Ticketmaster's secondary market.

62.     Plaintiff has suffered injury in fact, including loss of money, as a result of defendants' unfair practices.  Plaintiff and members of the class were directly and proximately injured by defendants' conduct and lost money as a result of defendants' conduct, because they paid more for Ticketmaster tickets on the secondary market and/or paid a cut that went to Ticketmaster after it secretly permitted, facilitated, and/or actively encouraged the sale of its tickets by scalpers on the secondary market using its TradeDesk platform.

63.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California and the nation.

64.     Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin defendants from continuing their unfair business practices, to restore to plaintiff and members of the class the money that defendants acquired from them by this unfair competition, and to provide such other relief as set forth below.

65.     Plaintiff requests an award of attorneys' fees under Cal. Civ. Proc. Code § 1021.5 for the benefit conferred upon the general public by any injunctive or other relief entered herein.

## SECOND CAUSE OF ACTION

### VIOLATION OF COMMON LAW OF UNJUST ENRICHMENT

66.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

67.     Plaintiff asserts this claim on behalf of the nationwide class.  Application of California law is appropriate given defendants' headquarters are in California and key decisions regarding the TradeDesk platform and related business practices described herein were presumably developed at their in-state headquarters, such that the wrongful conduct described herein emanated from California.

68.     As revealed by the undercover sting operation, fewer tickets are available on the primary market because defendants are (1) allowing scalpers to purchase tickets from the primary market in order to get a second cut; (2) facilitating the scalpers' ability to do so with systems like TradeDesk and EventInventory; and (3) encouraging scalpers to do so with a professional resale rewards program.

69.     Tickets are typically sold on the secondary market at a significant price increase, accounting for the success of the $5-billion industry.  This allows the scalper to recover the original amount paid for the tickets—as well as facility charges, and Ticketmaster service charges, order processing fees and delivery fees—and then some.  So consumers purchasing on the secondary market pay for all of this, part of which kicks back as part of the scalpers' fee to Ticketmaster—as well as an additional resale service charge to Ticketmaster.[35]

---

[35] https://www.ticketmaster.com/h/how-are-ticket-prices-determined.html?faq=1&_ga=2.169902368.1069550400.1537897980-1462309940.1532464279; Professional Reseller Handbook at 9.

70.    For example, a ticket on the original market may cost $32.00 with a facility charge of $3.00 and a Ticketmaster service fee of $9.75 and order processing fee of $4.25. And then that same ticket may be resold for $1,151.00 on a Ticketmaster secondary site—with another service fee of $210.06 to Ticketmaster on top of that. No wonder Ticketmaster likes working with the scalpers. It had $250 million in annual revenue from secondary sales in 2016.[36]

71.    Accordingly, defendants have benefitted and been enriched by their wrongful conduct. To the detriment of plaintiff and class members, defendants have and continue to be unjustly enriched as a result of the wrongful conduct alleged herein. Between the parties, it would be unjust for defendants to retain the benefits attained by its wrongful actions.

72.    Defendants have generated substantial revenue from the inequitable conduct described herein. Defendants have knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of plaintiff and the other class members. Defendants have voluntarily accepted and retained this benefit.

73.    Defendants should return to plaintiff and class members these ill-gotten gains resulting from their wrongful conduct alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter a judgment against defendant and in favor of plaintiff and class members, and grant the following relief:

A.    Determine that this action may be maintained as a class action with respect to the class identified herein and certify it as such under Rules 23(b)(2) and/or 23(b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint plaintiff as class representative and his counsel as class counsel;

B.    Declare, adjudge, and decree the conduct of defendants as alleged herein to be in violation of Cal. Bus. & Prof. Code § 17200 and the common law of unjust enrichment;

---

[36] https://www.forbes.com/sites/petercohan/2017/08/11/amazon-seeks-to-snag-5-billion-market-from-ticketmaster/#3289240c3042.

1    C.    Enjoin defendants from continuing their unlawful conduct;

2    D.    Award plaintiff and the class restitution of all monies paid to defendants as a result of

3    their unlawful conduct;

4    E.    Award plaintiff and the class reasonable attorneys' fees and costs; and

5    F.    Award plaintiff and the class such other further and different relief as the nature of the

6    case may require or as may be determined to be just, equitable, and proper by this Court.

7                                    **JURY TRIAL DEMAND**

8        Plaintiff, by counsel, requests a trial by jury for all claims so triable.

9
10   DATED:  September 28, 2018                    HAGENS BERMAN SOBOL SHAPIRO LLP

11                                                 By: */s/ Elaine T. Byszewski*
                                                   Elaine T. Byszewski (SBN 222304)
12                                                 301 N. Lake Avenue, Suite 920
                                                   Pasadena, CA  91101
13                                                 (213) 330-7150
                                                   *elaine@hbsslaw.com*
14
15                                                 Steve W. Berman (*pro hac vice* pending)
                                                   HAGENS BERMAN SOBOL SHAPIRO LLP
16                                                 1301 Second Ave., Suite 2000
                                                   Seattle, WA  98101
17                                                 (206) 623-7292
                                                   *steve@hbsslaw.com*
18
19                                                 *Attorneys for Plaintiff and the Proposed Class*

20
21
22
23
24
25
26
27
28